IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PERIRX, INC.,** | : |
| *Plaintiff,* | : Case No. 2:20-cv-02212-JDW |
| v. | : |
| **THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,** *et al.*, | : |
| *Defendants.* | : |

### **MEMORANDUM**

When PeriRx, Inc. entered into a license agreement with RNAmeTRIX, Inc. ("RNA"), it saw a path to riches. But like so many who have prospected for gold in California, it came up empty, despite years of effort and millions of dollars in expenditures. It blames that failure on underhanded conduct by a litany of parties, including the Regents of the University of California. PeriRx did not have a direct relationship with the Regents, but that hasn't stopped it from pursuing hundreds of millions of dollars in damages based on two theories: (1) RNA (with which PeriRx had a contract) was an alter ego of the Regents; and (2) PeriRx was a third-party beneficiary of a contract between RNA and the Regents. PeriRx has not mustered evidence to create a factual dispute with respect to either theory, though. The Court will therefore grant summary judgment to the Regents.

I.  **BACKGROUND**[1]

   A.  **Dr. Wong, RNA, And The UCLA Agreement**

The Regents of the University of California is an educational, research, and healthcare institution and nonprofit corporation that operates the University of California, Los Angeles. Dr. David T.W. Wong is a tenured professor at the UCLA School of Dentistry. Dr. Wong also has a lab at UCLA where he conducted research on which the Regents have filed patent applications. He is listed as an inventor on many of those applications.

Dr. Wong founded RNA in 2007. He claims to have used his personal funds to capitalize RNA and invested about $1.5 million into the company. He and his ex-wife, Sharon Wong, were the original shareholders of RNA, and they considered themselves to be members of RNA's board of directors. RNA did not have any other directors, and it never had an office or employees. Sharon Wong signed the company's bylaws as RNA's Secretary at the time of its incorporation. Years later, Dr. Wong and Sharon divorced, and Sharon resigned from RNA as a director, CEO, CFO, and Secretary. She also assigned her shares to Dr. Wong. No one replaced Sharon as an officer or director of the company. RNA has no board minutes, and it does not appear that Dr. Wong or Sharon ever voted on any corporate resolutions, at least with respect to any of the transactions at issue in this case. In fact, the record does not indicate that any board meetings occurred.

---

[1]   For the sake of brevity, the Court recites only those facts relevant to PeriRx's and the Regents' cross-motions for summary judgment as to PeriRx's claims against the Regents.

After its formation, RNA hired an attorney, Dr. Chris Byrd from the law firm Wilson Sonsini Goodrich & Rizzotti, to represent it in connection with negotiation of both an option agreement and a license agreement between the Regents and RNA. Emily Loughran handled the negotiations on behalf of the Regents. The negotiations lasted many months, covering the option agreement and the exclusive license agreement that was Appendix A to the option agreement. During the negotiation of both agreements, Dr. Byrd was adverse to the Regents, on behalf of RNA, and he tried to secure the best possible deal for RNA, taking his instructions from Dr. Wong.

On January 23, 2008, the Regents and RNA entered into the Exclusive Option Agreement (the "Option Agreement").[2] The Option Agreement gave RNA the option to obtain an exclusive license to the Regents' patent rights pursuant to the attached license agreement. After executing the Option Agreement, RNA started to look for a sublicensee. RNA learned about PeriRx in 2009, when one of PeriRx's partners, Dr. Jack Martin, reached out to Dr. Wong. The following year, RNA and PeriRx started discussing a potential license agreement for the patents in the Option Agreement.

Eventually, RNA exercised the option in the Option Agreement, and on December 17, 2010, the Regents and RNA executed the Exclusive License Agreement (the "UCLA Agreement"). The UCLA Agreement granted RNA an

---

[2]   The Regents and RNA amended the Option Agreement numerous times, but none of those amendments bears on the Court's resolution of the present cross-motions for summary judgment.

3

exclusive license under the Regents' patent rights to make, use, sell, offer for sale, and import licensed products and services. In exchange, the UCLA Agreement gave the Regents a 6% share in RNA, though RNA never issued stock certificates to the Regents. The record is unclear as to whether the Regents still owns 6% of RNA.

The UCLA Agreement authorized RNA to grant and authorize exclusive or nonexclusive sublicenses to third parties, consistent with the scope of RNA's license under the UCLA Agreement. If the UCLA Agreement was terminated, then it required UCLA to "enter into a license agreement with [all] Sublicensee(s)" and mandated that the terms of that license agreement be "substantially similar to the terms of the Sublicense granted by [RNA] to such Sublicensee, including but not limited to sublicense scope, sublicense territory, and duration of sublicense grant …." (ECF No. 119-4 at § 3.5.) The provision also limits the "right to enter into a New License Agreement" to situations where "(i) there is no outstanding material breach of such Sublicense by such Sublicensee which remains uncured, and (ii) the duties of The Regents under the New License Agreements will not be greater than the duties of The Regents under this Agreement, and the rights of The Regents under the New License Agreements will not be less than the rights of The Regents under this Agreement, including all financial consideration and other rights of The Regents." (*Id.*)

On December 20, 2010, three days after the UCLA Agreement took effect, RNA and PeriRx entered into an Exclusive License Agreement under which PeriRx

4

sublicensed licensing rights that RNA had licensed from the Regents.[3] Dr. Byrd continued to represent RNA in the negotiations of the License Agreement with PeriRx. PeriRx also had counsel during the negotiations. The Regents did not control Dr. Byrd's negotiations on behalf of RNA. Dr. Byrd did not take instructions from the Regents during those negotiations; and he did not submit proposed terms to the Regents for pre-approval.

### B. Termination Of The UCLA Agreement

On October 4, 2018, Dr. Wong reached out to Ragan Robertson at the Regents to discuss terminating the UCLA Agreement. Dr. Wong wanted to terminate the UCLA Agreement "because he was tired of dealing with RNA as a company, he realized he was not a good businessman, he wished to focus on his research, and had difficulties working with Stephen Swanick of PeriRx." (ECF No. 138 at ¶ 95.) On December 15, 2018, Dr. Wong sent Dr. Robertson an email with RNA's intent to terminate the UCLA Agreement. The Regents issued a Notice of Termination dated January 23, 2019, and the UCLA Agreement terminated on March 15, 2019. On multiple occasions during this time, Dr. Wong indicated his desire that the Regents enter into a direct license agreement with PeriRx and asked that a new agreement be completed before the UCLA Agreement

---

[3] RNA and PeriRx revised the Exclusive Licensing Agreement over time, first by an Amended and Restated Exclusive License Agreement and then by a First Amendment to Amended and Restated Exclusive License Agreement. The Court refers to the Exclusive License Agreement, the Amended and Restated Exclusive License Agreement, and the First Amendment to Amended and Restated Exclusive License Agreement between PeriRx and RNA, together, as the "License Agreement."

terminated. On February 5, 2019, the Regents provided PeriRx with a draft direct license agreement between the Regents and PeriRx, but the Regents and PeriRx never entered into a direct license agreement.

### C. The Present Litigation

On May 28, 2020, PeriRx brought a lawsuit against the Regents, Dr. Wong, RNA, EZLife Bio, Inc., and Aruras Holdings, LLC. PeriRx voluntarily dismissed its claims against Aruras, and the Court dismissed PeriRx's claims against Dr. Wong and EZLife Bio. On January 15, 2021, PeriRx filed a First Amended Complaint, asserting various breach of contract claims against the Regents and RNA only. In the simplest terms, PeriRx contends that RNA committed various breaches of the License Agreement between RNA and PeriRx and that the Regents are liable for those breaches pursuant to an alter ego theory of liability. PeriRx also asserts a direct breach of contract claim against the Regents as a third-party beneficiary based on the Regents' alleged breach of Section 3.5 of the UCLA Agreement. All of the Parties have moved for summary judgment on all of PeriRx's remaining claims. However, this memorandum is limited to PeriRx's and the Regent's cross-motions for summary judgment as to the claims against the Regents.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the

6

entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B).

The filing of cross-motions does not change this analysis. *See Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001). It "does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Id.* (quotation omitted). Rather, "[w]hen confronted with cross-motions for summary judgment 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Canal Ins. Co. v. Underwriters at Lloyd's London*, 333 F. Supp. 2d 352, 353 n.1 (E.D. Pa. 2004), *aff'd*, 435 F.3d 431 (3d Cir. 2006).

### III. DISCUSSION

#### A. Alter Ego Liability

The Court has determined that California law applies to all of PeriRx's claims against the Regents. (ECF No. 62 at ¶ 7.)  Under California law, if the alter ego theory of liability applies, the "owner of a corporation will be held liable for the actions of the corporation." *Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1249 (9th Cir. 2017) (quotation omitted). However, "the treating of one corporation as the alter ego of another is 'an extreme remedy, [to be] sparingly used' and is to be 'approached with caution.'" *Davidson v. Seterus, Inc.*, 230 Cal. Rptr. 3d 441, 456-57 (Cal. Ct. App. 2018) (quotations omitted). Thus, before a court will impose alter ego liability, the proponent must demonstrate: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist[,] and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." *Daewoo* 875 F.3d at 1249 (quotation omitted). An inequitable result "generally require[s] some evidence of bad faith conduct on the part of defendants." *Id.* at 1250 (quotation omitted).

To determine whether the first prong is met, i.e. whether there is sufficient unity of interest and ownership, courts consider various factors including whether there was:

- inadequate capitalization;
- commingling of funds and other assets;
- holding out by one entity that it is liable for the debts of the other;
- identical equitable ownership;

- use of the same offices and employees;
- use of one as a mere conduit for the affairs of the other;
- disregard of corporate formalities;
- lack of segregation of corporate records; and
- identical directors and officers

*Id.* (same). "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." *Hamilton Beach Brands, Inc. v. Metric & Inch Tools, Inc.*, 614 F. Supp. 2d 1080, 1083 (C.D. Cal. 2009) (same). Just as "the mere presence of some of these indicia is not dispositive, nor is it necessarily enough to survive summary judgment." *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 898 (9th Cir. 2021).

PeriRx has not submitted evidence to create a factual dispute that the Regents are RNA's alter ego. There is no evidence that the Regents and RNA comingled funds or other assets, that the Regents ever held itself out as liable for RNA's debts, that they had the same offices and employees, that there was a lack of segregation of corporate records, or that the two entities had identical directors and offices. There is also no evidence that RNA was undercapitalized. As the party asserting an alter ego theory of liability, it is PeriRx's burden to demonstrate that RNA was insufficiently capitalized. *See Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1295-96 (Fed. Cir. 2007) (applying California law). Yet PeriRx has not done so. It has not pointed to any "evidence of undercapitalization, such as insufficient capital 'to operate [the] business and pay its debts as they mature.'" *Ministry of Def. of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 769 (9th Cir. 1992) (quotation omitted). To the contrary, Dr.

9

Wong invested about $1.5 million of his personal funds into RNA. Rather than present evidence to rebut this testimony, PeriRx argues that the Court should not credit this evidence because Dr. Wong's testimony "is highly suspect" and there is no corresponding documentary evidence showing the infusion of funds into RNA. (ECF No. 138-29 at 20-21.) But the Court cannot make credibility determinations at summary judgment.

More generally, there is no evidence to support PeriRx's assertion that the Regents controlled "every aspect of the licensing agreements between RNA and PeriRx or that the Regents was the "puppet master behind the sham that is RNA." (ECF No. 138-29 at 1, 17.) Instead, the record suggests that the two entities were distinct. They negotiated, represented by separate counsel, over the terms of the UCLA Agreement and the License Agreement. And the Regents owned only 6% of RNA's stock. PeriRx points to a 2016 email from Dr. Wong to Wei Liao from EZLife Bio in which Dr. Wong claims that "Emily [(presumably Loughran from the Regents)] wants to see one company to take all the listed Ips, including those sublicensed to PeriRx." (ECF No. 122-112.) That lone statement—even if true—does not render RNA an alter ego of the Regents. It just shows that the Regents had an interest in how its patents were monetized and shared that information with Dr. Wong. PeriRx's other evidence falls even shorter. The fact that PeriRx and the Regents worked **together** to simplify the process of paying patent prosecution costs, by having the Regents send billings directly to PeriRx for payment, does not support a finding that the Regents and RNA were indistinguishable entities.

Some of the evidence that PeriRx relies on actually undermines its attempt to impose alter ego liability on the Regents. For example, RNA's counsel, Dr. Byrd, testified that the Regents never controlled his negotiations on behalf of RNA during negotiations with PeriRx as to the License Agreement. Nor did Dr. Byrd submit proposed terms to the Regents for pre-approval or otherwise take instructions from the Regents during those negotiations. When Dr. Wong had questions about RNA's rights and obligations under the UCLA Agreement between the Regents and RNA, Ragan Robertson from the Regents advised Dr. Wong that he was unable to discuss the matter with Dr. Wong himself, due to his conflict of interest and status as a UCLA employee. Instead, Dr. Robertson said he would discuss the issues with RNA's counsel—Dr. Byrd. This email contradicts PeriRx's assertion that the Regents controlled RNA or failed to operate at arm's length. In addition, PeriRx admits that it was Dr. Wong, not the Regents, who decided to terminate the UCLA Agreement, once he grew tired of dealing with RNA as a company and his stint as a businessman. The fact that Dr. Wong did not copy RNA's counsel on the various emails regarding termination of the UCLA Agreement is of no moment. PeriRx makes much of that fact, but it offers no explanation why Dr. Byrd should have been copied on the termination emails or how Dr. Wong's failure to include him demonstrates that RNA is somehow an alter ego of the Regents.

PeriRx has submitted evidence that suggests that RNA disregarded corporate formalities. Dr. Wong and his ex-wife Sharon seem to have been the

11

only individuals who were affiliated with RNA. The Wongs did not follow corporate formalities such as holding regular board meetings, adhering to company bylaws, voting on corporate resolutions, or recording minutes. They never issued stock certificates to the Regents or themselves. And, after the Wongs divorced, no one filled the CEO and CFO roles at RNA. As far as the Court can tell, Dr. Wong has been RNA's majority shareholder and sole principal since Sharon assigned her shares to Dr. Wong after their divorce.

But none of those facts demonstrate that RNA and **the Regents** were operating as one and the same. PeriRx offers no evidence that connects RNA's failure to follow corporate formalities to some overarching control by the Regents. The mere fact that Dr. Wong works for the Regents and used his UCLA email address to communicate is not sufficient to conclude that there was a sufficient unity of interest and ownership between the Regents and RNA such that the two entities should be treated as one. *See Ridgway v. Phillips*, No. 18-cv-7822, 2020 WL 1288464, at *5 (N.D. Cal. Mar. 18, 2020) (defendant's use of a personal email account that was not connected to her business fell "well short of creating a triable issue of fact as to the first prong of the alter ego test" at summary judgment). The mere fact that RNA failed to follow corporate formalities is not enough to survive summary judgment, especially where that failure has nothing to do with the Regents. *See Pac. Gulf Shipping*, 992 F.3d at 898. Thus, PeriRx cannot establish the first prong of the alter ego inquiry.

Even if PeriRx had amassed enough facts to demonstrate a sufficient unity of interest and ownership between the Regents and RNA, its alter ego theory of liability would still fail, because PeriRx has not demonstrated that treating RNA's actions as those of RNA alone would lead to an inequitable result. Although PeriRx contends that "UCLA utilized RNA for the sole purpose of attempting to insulate itself from liability" (ECF No. 122-145 at 18), it has not presented any evidence to support that assertion. It also has not shown, or even argued, that it is somehow precluded from holding RNA liable for the alleged breaches of the License Agreement. As a result, PeriRx has failed to satisfy the second prong of the alter ego inquiry and cannot demonstrate that the circumstances of this case warrant such an extreme remedy. *See Wesch v. Yodlee, Inc.*, No. 20-cv-5991, 2021 WL 3486128, at *7 (N.D. Cal. Aug. 5, 2021).

### B.   Third-Party Beneficiary

To assert its breach of contract claim against the Regents as a third-party beneficiary, PeriRx must demonstrate that: (1) it would in fact benefit from Section 3.5 of the UCLA Agreement; (2) a motivating purpose of the Regents and RNA was to provide a benefit to PeriRx; and (3) permitting PeriRx to bring its own breach of contract action against the Regents is consistent with the objectives of the contract and the reasonable expectations of the contracting parties. *Goonewardene v. ADP, LLC*, 434 P.3d 124, 133 (Cal. 2019). In general, whether a third party is an intended beneficiary of a contract is a question of fact. *Prouty v. Gores Tech. Grp.*, 18 Cal. Rptr. 3d 178, 184 (Cal. Ct. App. 2004) (citation omitted).

PeriRx has presented enough evidence to permit a trier of fact to determine that it is a third-party beneficiary of Section 3.5 of the UCLA Agreement. However, even if PeriRx qualifies as a third-party beneficiary, it cannot prevail on its breach of contract claim.

Section 3.5 of the UCLA Agreement guarantees a sublicensee like PeriRx the opportunity to enter into a new license agreement with the Regents. But Section 3.5 does not specify the exact terms of that new license agreement. Instead, it provides only that the terms will be "substantially similar," including as to the scope, territory, and term of the new agreement. (ECF No. 119-4 at § 3.5.) While the concept of "substantial similarity" put guardrails on the scope of the new license agreement (maybe narrow guardrails), it left room for negotiation about the exact terms of that new agreement. Therefore, Section 3.5 is either an agreement to agree on a new license agreement that is substantially similar to the License Agreement or an agreement to negotiate a new license agreement that is substantially similar to the License Agreement. Neither interpretation offers PeriRx any relief.

*First*, under California law, "agreements for future negotiations—so-called agreements to agree—are not enforceable contracts." *Reeder v. Specialized Loan Servicing LLC*, 266 Cal. Rptr. 3d 578, 585 (Cal. Ct. App. 2020) (quotation omitted). Indeed, "there is no contract where the objective manifestations of intent demonstrate that the parties chose not to bind themselves until a subsequent agreement is made." *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309,

14

316 (9th Cir. 1996) (citation omitted). As a result, "the law 'provides [no] remedy for breach of an agreement to agree' … because '[t]he court may not imply what the parties will agree upon.'" *Copeland v. Baskin Robbins U.S.A.*, 117 Cal. Rptr. 2d 875, 881 (Cal. Ct. App. 2002) (quotation omitted). Thus, to the extent Section 3.5 constitutes an agreement to agree, it offers PeriRx no path to recovery. PeriRx seems to agree with this principle because it did not address the Regents' agreement-to-agree argument anywhere in its briefing. (*See generally* ECF Nos. 138-29, 142, 149.)

*Second*, PeriRx cannot prevail on an agreement-to-negotiate theory, for several reasons. Unlike an agreement to agree, an agreement to negotiate is enforceable under California law. *See Copeland*, 96 Cal.App.4th at 1257. But PeriRx has disclaimed that theory, arguing that "an agreement to negotiate … does not exist here. UCLA was mandated to enter into an agreement with PeriRx." (ECF No. 138-29 at 13.) PeriRx's disclaimer of this theory is binding and means it cannot prevail on it. *See, e.g., Krough v. Calpine*, No. 20-cv-3025, 2021 WL 4347741, at *3 n.4 (3d Cir. Sept. 24, 2021). In any event, under California law, a party "will be liable only if a failure to reach ultimate agreement resulted from a breach of that party's obligation to negotiate or to negotiate in good faith." *Kelly v. Worth Holdings, LLC*, No. 17-cv-2466, 2017 WL 4156186, at * 6 (N.D. Cal. Sept. 18, 2017) (quotation omitted).  PeriRx does not dispute that the Regents sent a proposed new license agreement, so there is no evidence of a total refusal to negotiate, and PeriRx has offered no evidence suggesting that the Regents

15

negotiated in bad faith. The failure to finalize an agreement, by itself, cannot constitute bad faith.

Separately, California law only permits reliance damages, not expectation damages for a breach of an agreement to negotiate. *See Copeland*, 117 Cal. Rptr. 2d at 883, 886. But PeriRx does not seek to recover reliance damages in this case. It seeks expectation damages for profits it claims it would have earned from the "development and **sale of commercial products** for (1) Insulin resistance/prediabetes/diabetes testing; (2) point of care testing for infectious diseases; and (3) liquid biopsy testing for early lung cancer detection." (ECF No. 142 at 4 (emphasis added).) Because PeriRx cannot recover the damages that it seeks, it cannot prevail on its claim, even if it had evidence that the Regents had breached an agreement to negotiate.

## IV.   CONCLUSION

PeriRx had grand ambitions for its relationship with RNA. But nothing before the Court suggests that the Regents have any responsibility, let alone liability, for PeriRx's inability to achieve those lofty heights. It has not shown that the Regents and RNA were alter egos, so it has not basis to hold the Regents liable for RNA's alleged breaches of the License Agreement. Nor has it shown that it has a viable breach of contract claim against the Regents, even if it is a third-party beneficiary of the UCLA Agreement. As a result, the Regents is entitled to summary judgment on this claim as well. An appropriate Order follows.

**BY THE COURT**:

*/s/ Joshua D. Wolson*
HON. JOSHUA D. WOLSON
United States District Judge

December 10, 2021